**362**

UNITED STATES of America, for the use of BISON CONSTRUCTION CO., a North Dakota corporation, Plaintiff,

v.

GEER–MELKUS CONSTRUCTION COMPANY, formerly Geer-Maurer Construction Company, a corporation, and Pennsylvania Fire Insurance Company, a corporation, Defendants and Third-Party-Plaintiffs,

v.

KEMPER CONSTRUCTION COMPANY, a North Dakota corporation, Third-Party-Defendant.

Civ. No. 3828.

United States District Court
D. North Dakota,
Northeastern Division.

July 13, 1961.

As Amended July 18, 1961.

Philip B. Vogel, Wattam, Vogel, Vogel, Bright & Peterson, Fargo, N. D., for plaintiff.

Robert Vaaler, Day, Stokes, Vaaler & Gillig, Grand Forks, N. D., for defendants and third-party plaintiffs, Geer-Melkus Constr. Co. and Pennsylvania Fire Ins. Co.

Henry G. Ruemmele, Grand Forks, N. D., and Richard H. McGee, of McGee, VanSickle & Hankla, Minot, N. D., for third-party defendant, Kemper Constr. Company.

RONALD N. DAVIES, District Judge.

This action was commenced by the Use Plaintiff, Bison Construction Company (hereinafter Bison), under 40 U.S.C.A. §§ 270a–270b, commonly called the Miller Act, against Geer-Melkus Construction Company (hereinafter Geer-Melkus) as prime contractor and the Pennsylvania Fire Insurance Company (hereinafter Pennsylvania) as surety upon the prime contractor's payment bond for labor and materials claimed to have been furnished in the prosecution of work under a contract between the United States and Geer-Melkus for construction of a Readiness Crew Building and Alert Hangar Protection at Grand Forks, North Dakota, Air Base. The prime contract was executed June 27, 1958, and the payment bond executed by Pennsylvania as surety the same day. Thereafter Geer-Melkus entered into a subcontract with the Use Plaintiff Bison to furnish labor and materials for construction of certain roads, paving, topsoiling and utilities, required under the prime contract.

Bison in turn subcontracted with the Third-party Defendant, Kemper Construction Company (hereinafter Kemper) for installation of certain water mains as part of the utilities called for in the Bison-Geer-Melkus contract. Kemper, pursuant to the plans and specifications of the Army Corps of Engineers (hereinafter Army Engineers) and under their supervision, completed installation of the water main by the end of October, 1958. The water main was

successfully subjected to a hydrostatic test which was required by the Army Engineers, was flushed, drained and then shut off at a valve junction some distance from the building site. Kemper had expedited installation of the water main at the request of Geer-Melkus who wished water available at the building site so that masonry work could be done. Final connections between the water main and building were to be made by Geer-Melkus.

Although the prime contract specified the water main should be at a minimum depth of seven feet below ground level, Kemper replaced soil over the main only to the then existing grade level. This resulted in a portion of the main being covered to a depth of only five feet. Additional cover was to be added to place the water main at the required seven foot depth when Bison completed the roads, paving and topsoiling. This portion of the Bison-Geer-Melkus subcontract was to be performed just prior to completion of the prime contract.

Kemper, accompanied by a representative of Bison, informed Geer-Melkus that the water main installation had been completed but that an additional two feet of soil cover was necessary to protect the water main during the winter months. Subsequently, without objection from either Bison or Geer-Melkus, Kemper removed its equipment from the job site. Shortly thereafter a storm sewer was installed adjacent to the water main, one foot above it and one foot away from it, by a contractor not involved in this action.

Geer-Melkus had the final connections to the building from the water main installed, and the "shutoff" valve opened. Water from the main was used until January 13, 1959, at which time Geer-Melkus employees, while using a back hoe to excavate for placement of fuel oil tanks, struck and pierced the water main. Before the "shutoff" valve could be closed, the excavation partially filled with water, some of which drained off into the storm sewer which had been pierced at the same time. The excavation was drained and filled with flax straw which the evidence showed was an accepted temporary method of preventing freezing. This condition existed until Bison repaired the break in March, 1959. The water main was again subjected to hydrostatic tests and accepted by the Army Engineers after which it was in use until April 12, 1959, when it again broke. This latter break was approximately twenty feet from the first break and closer to the building. Water flowed from the break into the adjacent building causing considerable damage. Repairs were made by Kemper April 14, 1959, at Geer-Melkus' request, and it was then discovered that frost had penetrated the earth surrounding the water main. The cause of the break was attributed to "differential heave" by the Army Project Engineer who defined the term as "an uneven thawing of the frozen earth forcing a movement or 'heave' of the ground." Testimony indicated this could have occurred whether or not there was water in the main.

Kemper was paid in full for the water main installation by Bison but Geer-Melkus, believing it was the fault of either Bison or Kemper that the main had broken and the resulting damage occurred, withheld payment to Bison of $16,196.19. Hence, this lawsuit. Geer-Melkus in its Answer and in its Third-party Complaint against Kemper alleged that Bison and/or Kemper were negligent in the installation of the main, and secondly, that Bison and/or Kemper breached warranties of fitness of materials and workmanship and that the water main would be installed in accordance with the plans and specifications.

Basically the issues here are factual, that is, what was the cause of the April break in the water main, and who was responsible for the resulting damage?

Kemper installed the water main according to the plans and specifications provided with materials that met the required Government standards. The work was done under supervision of the Army Engineers and approved by them. After

the water main had met the standards of the hydrostatic test, Kemper had it flushed, drained and shut off. Then, accompanied by a representative of Bison, Kemper informed Geer-Melkus' representative that the water main installation had been completed but that an additional two feet of soil cover was necessary to protect it and that the main should not be used until this was done. As a matter of fact, the Court finds nothing in the testimony or evidence that would show negligence on the part of Kemper or Bison. Although Bison was to have added the remaining two feet of cover, all parties hereto were fully aware that this would not be done until just prior to completion of the entire prime contract, nor may it be said that the lack of adequate cover was the proximate cause of the April break. The laying of the storm sewer practically on top of the main, the breaking of the main in January by Geer-Melkus, the resulting soaking of the surrounding earth by water, and the leaving of the water main for more than a month with only flax straw for cover were all contributing factors.

The negligence here was that of Geer-Melkus in using the water main without first insuring that sufficient cover was placed over it to prevent freezing. It must be borne in mind that the water main had been installed expeditiously at the request of Geer-Melkus and placed under Geer-Melkus' control for its use. While it is true that the water main could have broken irrespective of whether there was water in it or not, it was the water that escaped from the break into the building causing the damage. In the circumstances of this case as shown by the evidence neither Bison nor Kemper were negligently responsible.

The alleged breach of warranties arises out of the claim that Kemper and/or Bison defectively installed the water main by failing to place it at the minimum depth of seven feet as required by the plans and specifications. What has heretofore been said concerning the lack of any showing of negligence on the part of Bison and Kemper could be here repeated, but it is enough to say that *if* the lack of sufficient cover caused the main to break in April due to frost penetration of the ground surrounding the main, it was, nevertheless, the escaping water which caused the damage. Geer-Melkus, after assuming control of the water main and using it with full knowledge that there was insufficient cover, cannot be heard to complain this late in the day.

Bison is entitled to judgment against Geer-Melkus and Pennsylvania jointly and severally in the sum of $16,196.19, the amount remaining unpaid under the subcontract together with interest thereon at the rate of four per centum per annum from September 9, 1960, plus Bison's costs and disbursements to be fixed and assessed by the Clerk of this Court.

Geer-Melkus is entitled to no relief against Bison on the counterclaim nor against Kemper as prayed for in the Third-party Complaint.

Defendants' Exhibit 8 having been stipulated into the record at the pre-trial conference held March 28, 1961, showing that Kemper had repaired the water main as shown by said exhibit which bears date of April 29, 1959, Kemper is entitled to recover from Geer-Melkus the sum of $580.82 with interest thereon at four per centum per annum from May 29, 1960, plus Kemper's costs and disbursements to be fixed and assessed by the Clerk of this Court.

This memorandum is considered in compliance with F.R.Civ.P., Rule 52(a), 28 U.S.C.A.

The attorneys for the Use Plaintiff, Bison Construction Company, will prepare form of judgment and transmit the same to the Clerk of this Court.

It is so ordered.